## WILLIAM WARGO v. THE CONNECTICUT LIGHT AND POWER COMPANY.

## HELEN DELMAR v. THE CONNECTICUT LIGHT AND POWER COMPANY.

MALTBIE, C. J., BROWN, JENNINGS and ELLS, Js.[1]

Argued January 9—decided March 7, 1941.

[1] By agreement of counsel the case was argued before and decided by four judges.

*Walter F. Torrance,* for the appellant (defendant).

*J. Warren Upson* and *Nathan A. Resnik,* with whom was *William J. Secor, Jr.,* for the appellees (plaintiffs).

ELLS, J.   There was a freshet in the Housatonic River due to heavy rains and melting snow, and on the morning of March 12, 1936, the flood waters swept away the cottages and damaged the land of the plaintiffs situated about a mile below the dam owned and maintained by the defendant as a part of its hydro-electric development at Stevenson.   Actions were brought claiming various acts of negligence by the defendant in the construction and operation of the dam. In the complaints these claims were set up at length in two counts, one based on the theory of negligence and the other on nuisance grounded on negligence.

The defendant denied these allegations, and set up several special defenses, including act of God.   The two cases were tried together before the jury and a verdict was returned for the plaintiff in each case, which, upon motion, the trial court refused to set aside. The defendant appealed.   Interrogatories were submitted in each case, and in their answers the jury found the plaintiffs had proved by a fair preponderance of the evidence that the defendant was guilty of actionable negligence alleged in the complaint and of creating and maintaining a nuisance as there alleged; and that the defendant had not proved by such preponderance that the injury was caused by act of God.

The first question is whether the evidence reasonably supports the jury's finding that the defendant was negligent in one of the material respects alleged

in the complaint. Facts concerning which there is no disagreement are as follows: The dam runs across the river in a north and south direction and is twelve hundred feet long. The powerhouse is on the southerly end and occupies about six hundred feet of the dam. On March 11th to 12th there were three penstocks in operation. These are pipes or tubes which convey the water to the water wheels below. Then there is a spillway five hundred and forty-six feet long, divided into twenty-one sections of twenty-six feet each. The elevation of the crest of twenty of these spillway sections is at 100.25 referred to mean sea level, and that of the remaining one, nearest the powerhouse, is ninety-five. This section contains the skimmer gate, which can be raised or lowered. Five permanent waste sluices, each having an equivalent of five foot diameters are located in the dam just beyond the powerhouse, and about fifty feet below the crest of the dam. They are steel lined and closed off by means of five foot diameter gate valves located in a tunnel in the dam. Except during periods of high water the stream runs through the penstocks, manufactures the power and is discharged into the river below. At high water the stream is also discharged by one or both of two additional methods; over the spillways, including the skimmer gate, and through the sluices. The dam as originally constructed in 1919 creates a lake about eight and one-half miles long covering an area of one thousand and three acres. The state engineer approved the dam as originally constructed and issued the preliminary and final certificates required by law. About two years later the defendant erected flashboards upon the crest of the twenty spillway sections. Thus there were twenty sets of flashboards, each twenty feet long and about three feet high, and made of wood.

The parties were riparian proprietors, and as such

their rights are well settled. " 'An upper proprietor upon a stream has no right to gather and impound waters and then suddenly let them loose on the land of the lower proprietors. Each riparian owner is limited to the reasonable use of the water with due regard to the rights and interests of such other owners. It is the common right of all to have the stream preserved in its natural size, flow and purity without material diversion.' " *Beauton* v. *Connecticut Light & Power Co.*, 125 Conn. 76, 81, 82, 3 Atl. (2d) 315; *Harvey Realty Co.* v. *Wallingford*, 111 Conn. 352, 359, 150 Atl. 60. The defendant's claim is that the flood water came down into the lake or pond in increased amount when ice jams broke, and was not impounded; that it flowed on over the dam and through the flood gates and penstocks in the same quantity as it entered and that the defendant did not accelerate its flow by withholding and then releasing it. If the jury took this view, the plaintiffs could not recover. If the plaintiffs proved by a fair preponderance of the evidence that the defendant allowed a large amount of water suddenly to escape and that this was a proximate cause of the plaintiffs' injuries, they could recover. *Beauton* v. *Connecticut Light & Power Co.*, supra, 82; see also the cases there cited, page 83.

One of the principal issues of negligence had to do with the construction and maintenance of the flashboards. The plaintiffs claimed upon the evidence that they were erected without the permission required by § 3004 of the General Statutes, and that this violation of the statute constituted negligence. The jury could reasonably have found that this charge was proved. The defendant's major contention is that such negligence was not a substantial factor in producing the injury. This is a close question. Relying on *Horvath* v.

*Tontini,* 126 Conn. 462, 464, 11 Atl. (2d) 846, the defendant contends that under exceptional circumstances a verdict may be set aside even if there was some evidence in favor of the prevailing party. It relies particularly upon *Anderson* v. *Colucci,* 119 Conn. 241, 245, 175 Atl. 681, where we said: ". . . the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses as in any other respect, and the operation of such influences may be manifested by the acceptance as credible and the giving of determining effect to evidence which is irreconcilable with, for example, the laws of mechanics or admitted or indubitably established physical facts."

Evidence tending to support the verdict was furnished by the state engineer who inspected the dam when it was built. From this and other testimony the jury could reasonably have found that the flashboards were erected without the permission required by statute and that if they gave way would produce a rapid and dangerous increase in the height of water in the river below by suddenly releasing the large quantity of water which had been held back by them. It was the opinion of the state engineer that the flashboards might all go down at about the same time, sending a flood of water down the stream which would be destructive of property. The crux of the defendant's claim is that engineers in its employ testified that the steel pipes supporting the flashboards were of differing tensile strength and therefore would give way at different times. The result, they said, would be that a dangerous flood of water would not suddenly be discharged, but, as the flashboards went down one by one, the water impounded by them would be released gradually. These engineers were of the opinion that the

flashboards would so go out separately soon after the water reached an elevation of one hundred and three, —that is, soon after it commenced to run over the top of them, and therefore that they would have given way hours before the sudden rise in the river below which caused the injury complained of. They had no actual knowledge, however, as to when the flashboards gave way; when the water receded they were gone. Testifying from records kept at the dam, they said that at 4 o'clock in the afternoon on March 11th the water reached an elevation of 103.3 feet, that as the flood increased the highest readings of the staff gauge were at 4.30 and 9 on the morning of the 12th, 108.4 and 109.5 respectively. The water rose suddenly on the lands of the plaintiffs and reached its greatest depth at a little after 9 o'clock. It was at that time that the cabin of the plaintiff Wargo was washed away. The water then receded rapidly. The elevation of the top of the flashboards was one hundred and three. In a previous flood the flashboards then on the dam had gone out when the water was at 106.9; but the flashboards there in March, 1936, while generally similar, were not installed in the same way. The jury might reasonably have concluded that the additional foot of water above the height it had reached at 4.30, flowing over the dam about 9 o'clock, finally caused the flashboards to go out and that this was a substantial factor in causing the injury complained of.

The defendant produced evidence that ice jams in the river above the dam broke at those hours and released a sudden flood of water which flowed unimpeded over the crest of the cement dam. It claims that the jury could not reasonably believe the state engineer because he was an aged man and lacked knowledge concerning these particular flashboards and their method

of construction. We cannot say that his testimony was so unreasonable that it could not have been believed by the jury. From his testimony the jury could find that they might go down at one time, and this would receive support, in that connection, in coupling this testimony with the sudden rise in the water at the time one of the cabins was destroyed. The defendant did not produce any outside engineer. The expert opinions of its employee engineers were based largely upon a log book kept at the dam. Although we do not find it necessary to discuss that factor, the question whether the defendant was negligent in not seasonably opening the flood gates was an important issue. The log book entry was that the skimmer gate was lowered six feet at 8.55 a. m. on March 12th,—a vital time. The engineer in charge testified the entry was an error; that the gate was lowered the preceding afternoon. Apparently no attempt was made to produce the man who made the entry. All this may have caused the jury to consider the all important log book with suspicion.

The jury may not have adopted the testimony of one of the defendant's engineers that the breaking of the ice jams would produce waves, accounting for the height of the water at particular times. In any event, as there was evidence from which the jury reasonably could infer that the flashboards did go out practically simultaneously at about the time the damage was inflicted, producing the extreme height of water in the valley below, we cannot say that they could not reasonably have found that this event materially contributed to the flood and was a proximate cause of the injury.

These conclusions render unnecessary a discussion of the other specifications of negligence. Two of the three special defenses are not before us on these ap-

peals, and the defense of act of God is not pursued in the defendant's brief.

There is no error in either case.

In this opinion the other judges concurred.